EXHIBIT
A

STATE OF NORTH CAROLINA

COLUMBUS COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 25CV002290-230

| | | |
|---|---|---|
| COLUMBUS COUNTY,<br><br>Plaintiff,<br><br>vs.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); AGC CHEMICAL AMERICAS, INC.; AGC INC. F/K/A ASAHI GLASS CO.; ARCHROMA US, INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE PROTECTION CO.; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORP.; CORTEVA, INC.; DOE DEFENDANTS, JOHN 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORP.; E.I. DU PONT DE NEMOURS & COMPANY; THE ANSUL COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AND TYCO FIRE PRODUCTS, LP,<br><br>Defendants. | ) | **COMPLAINT AND JURY DEMAND** |

Plaintiff Columbus County, North Carolina (hereafter "County" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants 3M Company; E. I. DuPont De Nemours and Company; The Chemours Company; The Chemours Company, FC LLC; Chemguard, Inc.; Tyco Fire Products, LP; Ansul Company; Buckeye Fire Equipment Company; AGC Chemical Americas, Inc.; AGC Inc. f/k/a Asahi Glass Co.; Archroma US, Inc.; Arkema Inc.; BASF Corporation; ChemDesign Products, Inc.; Clariant Corp.; Corteva, Inc.; DuPont De Nemours, Inc.; Dynax Corp.; and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiff, based on information, belief and investigation of Counsel,

alleges as follows:

## I. SUMMARY OF THE CASE

1. Plaintiff brings this action against Defendants to recover the considerable costs and damages that it has incurred, or may incur, as a result of the presence of toxic compounds, identified as per- and polyfluoroalkyl substances ("PFAS"), in Plaintiff's public water supply and landfill property.

2. Plaintiff owns and operates four water districts which draw water from groundwater wells to provide drinking water to residential, commercial, business, and municipal customers.

3. Plaintiff owns and operates a landfill located on Landfill Road in Columbus County, NC.

4. Upon information and belief, two sources caused PFAS contamination in Plaintiff's water supply and at Plaintiff's landfill: 1) a manufacturing facility called Fayetteville Works, which is located along the Cape Fear River, upstream of the County, along on the border of Bladen County and Cumberland County and 2) PFAS-containing products which Defendants designed, manufactured, marketed, distributed, and/or sold.

5. For forty years, the Fayetteville Works Defendants[1] generated, discharged, improperly disposed, and caused for the release of a number of different kinds of PFAS including GenX, PMPA, PFMOAA, Nafion Byproduct PFAS, and PEPA, among others. This generation, release, and improper disposal of PFAS resulted in PFAS entering Plaintiff's water supply and landfill properties.

[1] The Fayetteville Works Defendants are companies responsible for contamination associated with the Fayetteville Works Facility in North Carolina. The Fayetteville Works Defendants include the following: The Chemours Company; The Chemours Company FC, LLC; E.I. Du Pont de Nemours and Company; DuPont de Nemours, Inc.; and Corteva, Inc. As used in this complaint, "Defendants" includes these entities, as the "Fayetteville Works Defendants" are also responsible for PFAS-containing products.

6. At all relevant times, upon information and belief, the Fayetteville Works Defendants knew, or reasonably should have known, about the inherent risks and dangers involved in the release and improper disposal of PFAS generated at Fayetteville Works —including that PFAS compounds are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. At all relevant times, technology and practices existed that could have prevented harm of the kind suffered by Plaintiff due to Fayetteville Works PFAS. One Fayetteville Works PFAS, called GenX, has been detected in groundwater at a landfill and drinking water in Columbus County.

7. In addition, the use of certain products has further caused contamination with two highly toxic PFAS compounds: PFOA & PFOS

8. PFOA and PFOS have long been manufactured as components for aqueous film-forming foam ("AFFF")—a product used to control and extinguish aviation, marine, fuel, and other shallow spill fires.

9. PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegrade, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy- induced hypertension and preeclampsia, and cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[2]

---

[2] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 1/8/2025); *see also* EPA, Office of Water Health and Ecological Criteria Division,

10. Upon information and belief, at various times throughout the 1960s to present date, Defendants designed, manufactured, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or AFFF containing PFOA, PFOS, and/or their chemical precursors (collectively, "Fluorosurfactant Products") throughout the United States, including in North Carolina.

11. At all relevant times, upon information and belief, Defendants knew, or reasonably should have known, about the inherent risks and dangers involved in the use of PFAS compounds in their products—including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sale, and otherwise place Fluorosurfactant Products into the U.S. stream of commerce for decades, all while knowing PFAS compounds would be inevitably released into the environment—for instance, in the use of AFFF for fire protection, training, and response activities, even when used in the manners directed and intended by the manufacturer—and concealing their knowledge of the risks involved.

12. Plaintiff's wells, water sources and supply, water supply and delivery system infrastructure, treatment systems and associated reject or waste, landfill property, and all other property associated with Plaintiff's drinking water systems and landfill property are collectively referred to as "Plaintiff's Property" in this Complaint.

13. At all relevant times, Plaintiff did not know, nor should it have reasonably known, of the ongoing contamination of its Property through the use of

"Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 1/8/2025).

Defendants' Fluorosurfactant Products, as Defendants did not disclose the toxic nature and harmful effects of their Fluorosurfactant Products.

14. As a result of Defendants' unreasonable acts and omissions, PFAS compounds have migrated through the soil and into the groundwater, have entered into a critical source of water relied upon by Plaintiff to provide for its citizens and customers, and have contaminated Plaintiff's Property—thereby subjecting Plaintiff, its customers, and the general public to the inherent danger of these chemicals. As the manufacturers and sellers of Fluorosurfactant Products, Defendants are responsible for the PFAS contaminants released into Plaintiff's Property.

15. Through this action, Plaintiff now seeks to recover all available damages arising from the continuous and ongoing contamination of Plaintiff's Property caused by Defendants' actions as asserted herein. Such damages include, but are not limited to, the past and future incurred costs associated with the investigation, remediation, restoration, monitoring, and treatment of Plaintiff's Property.

## II. SETTLEMENTS

16. Plaintiff is a Public Water System and Class Member participating in settlements with 3M, Tyco, and BASF in the *City of Camden* matter in MDL 2873. In this Complaint, Plaintiff does not seek damages for contamination of its public drinking water system from Defendants Tyco Fire Products LP, BASF Corporation, and 3M Company. The Tyco Settlement Agreement, the BASF Settlement Agreement, and the 3M Settlement Agreement have fully and finally resolved all of Plaintiff's Claims against Released Parties arising out of, related to, or involving PFAS that has entered or is associated with Drinking Water or any Releasing Party's Public Water System.

17. Plaintiff is not a Class Member to the DuPont settlement in the *City of Camden* matter in MDL 2873. Section 5.1.2.(a) of the DuPont Class Action Settlement Agreement excludes public water systems in Columbus County.

18. Plaintiff brings this action against all Defendants -- including Defendants Tyco Fire Products LP, BASF Corporation, and 3M Company – to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring relating to PFAS contamination of its landfill, leachate, groundwater beneath the landfill, and/or other landfill-associated properties.

19. Plaintiff brings this action against all other Defendants named in this Complaint to recover any and all past and future compensatory and/or consequential damages arising from PFAS contamination of its public drinking water system including water resources, water supplies, water supply, water sources, and all infrastructures, facilities, and/or properties used for collection, treatment, storage, and distribution of drinking water. Plaintiff also brings this action against all other Defendants to recover damages arising from PFAS contamination of its landfill, leachate, groundwater beneath its landfill, and other landfill-associated properties.

## III. PARTIES

### A. *PLAINTIFFS*

20. Columbus County is a county located in southeastern North Carolina. Its primary address is 127 W. Webster Street, Whiteville, NC 28472.

21. Plaintiff operates four water systems, which draws raw water from groundwater wells. The four districts include: District 1, District 2-3-5, District 4, and Lakeland.

22. Plaintiff also owns and operates a landfill, including areas of the landfill that are operating and areas that are closed.

23. Plaintiff's service area includes areas served by various fire departments located in Columbus County. Upon information and belief, Defendants' AFFF products were used for fire-training and fire-fighting activities at sites in and around the County and its wells.

24. Plaintiff has a property interest in the water it appropriates, treats, stores, and distributes to the public, as well as an interest in its wells, piping, distribution system, treatment facilities, and real property.

*B.* *DEFENDANTS*

25. Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have contaminated and continue to contaminate Plaintiff's Property, causing irreparable harm.

26. **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

27. 3M is the only company that manufactured and/or sold AFFF containing PFOS.

28. **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

29. **AGC AMERICA:** Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

30. **ANSUL:** Defendant Ansul Company is a corporation organized and existing under the laws of the State of Wisconsin. This Defendant manufactured, marketed, and sold AFFF products that contained PFOA.

31. **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

32. **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

33. **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

34. **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

35. **CHEMDESIGN:** Defendant Chemdesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

36. **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

37. **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours has operated the Fayetteville Works facility since 2015.

38. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds and from the generation and release of PFAS from Fayetteville Works.

39. **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company that conducts business throughout the United States. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899. Chemours Company FC has owned the Fayetteville Works Site since January 2015. The Chemours Company FC, LLC is a subsidiary of The Chemours Company, and the two entities are referred to in this complaint as "Chemours."

40. **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

41. **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Corteva does business throughout the United States, including conducting business in North Carolina, and is registered to do business in North Carolina with the Secretary of State. Corteva may be served at its principal place of business, through the North Carolina Secretary of State, or wherever it may be found. Corteva – along with New DuPont – assumed Old DuPont's PFAS liabilities.

42. **DUPONT:** Defendant E. I. Du Pont De Nemours and Company (aka EDIP, Inc.) ("DuPont" or "Old DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont owned and operated the Fayetteville Works facility from approximately 1971 until 2015 and currently leases a portion of the Site from Defendant Chemours Company FC, LLC.

43. **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a DowDuPont, Inc.) ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont.

44. Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

45. Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

46. New DuPont – along with Corteva – assumed Old DuPont's PFAS liabilities.

47. **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive,

Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

48. **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

49. Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

50. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

51. Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the County will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

52. All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of North Carolina.

53. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

54. The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## IV. JURISDICTION & VENUE

55. This Court has jurisdiction pursuant to N.C.G.S. § 7A-243 because the amount in controversy exceeds twenty-five thousand dollars ($25,000,00).

56. This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in North Carolina, or otherwise intentionally avails itself of the North Carolina market either through the distribution or sale of products containing PFAS in the State of North Carolina or by having a manufacturing, distribution or other facility located in North Carolina so as to render the exercise of jurisdiction over it by the North Carolina courts consistent with traditional notions of fair play and substantial justice.

57. Venue is appropriate in this county pursuant to N.C.G.S. §§ 1-76 to 1-80, as facts giving rise to the Plaintiff's causes of action arose in Brunswick County, and the plaintiff is situated in, resides, and does business in this County.

## V. FACTUAL ALLEGATIONS

58. PFAS contamination in Plaintiff's Property is attributable to two sources: PFAS-containing Fluorosurfactant Products and the Fayetteville Works Facility.

### *A. SOURCE: FLUOROSURFACTANT PRODUCTS*

59. The use, storage, and handling of Fluorosurfactant Products has resulted in widespread contamination involving a number of PFAS compounds, chief among them PFOA & PFOS.

60. Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

61. PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

62. PFOA and PFOS are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

63. Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil and air as well as in human food supplies, breast milk, umbilical cord blood, and humanblood serum.[3]

64. Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

---

[3] *See* Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances and Your Health," available at https://www.atsdr.cdc.gov/pfas/about/health-effects.html (last accessed 1/7/2025).

[4] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological

65. Notably, from the time these two compounds were first produced, information has since emerged showing negative health effects caused by exposure to PFOA and PFOS. According to the EPA, "studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).[5] The EPA has warned that there is suggestive evidence of the carcinogenic potential for PFOA and PFOS in humans.[6]

66. Additionally, the EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an airfield at which [PFOA/PFOS] were used for firefighting."[7]

---

Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 1/7/2025); *see also* EPA, Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 1/7/2025).

[5] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed 1/7/2025).

[6] *See* EPA, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 1/7/2025).

[7] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-

67. EPA continues to research the effects of PFAS. In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt). EPA announced new Interim Updates Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[8]

### *1. Aqueous Film-Forming Foam (AFFF) was a Product Containing PFOS and/or PFOA at the Relevant Time Period*

68. Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

69. Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

70. The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

---

water-health-advisories-pfoa-and-pfos (last accessed 1/7/2025).

[8] EPA, "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number 822-F-22-002, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf (last accessed 1/7/2025).

71. When used as the Defendants intended and directed, the AFFF manufactured and/or sold by the Defendants released PFOA and/or PFOS into the environment.

72. Once PFOA and PFOS are free in the environment, they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

73. Notably, AFFF can be made without PFOA and PFOS. As such, fluorine-free foams do not release PFOA and/or PFOS into the environment.

74. Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to the ongoing contamination and damages to Plaintiff's Property.

75. Defendants' Fluorosurfactant Products have been used for their intended purposes in the process of fire protection, training, and response activities within North Carolina for many years. During these activities, Defendants' Fluorosurfactant Products were used as directed and intended by the manufacturer, which allowed PFOA and PFOS to migrate through the subsurface and into the groundwater, enter into Plaintiff's property, thereby contaminating Plaintiff's wells and property, as well as causing other extensive and ongoing damages to Plaintiff's Property.

76. Due to the chemicals' persistent nature, among other things, these chemicals have caused, and continue to cause, significant injury and damage to Plaintiff and Plaintiff's Property.

### 2. *DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF THE DANGERS INVOLVED*

77. On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

78. At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

79. For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[9]

80. By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

81. In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant

---

[9] *See* Envtl. Working Group ("EWG"), "New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed 1/7/2025) (in particular, please refer to the "Letter from 3M to Office of Pollution Prevention and Toxics," referenced in the article).

workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[10]

82. Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[11]

83. Notwithstanding their respective knowledge of the dangers involved with AFFF containing PFOA and/or PFOS, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or sold AFFF containing PFOA and/or PFOS; (2) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil and/or waste water disposal systems), thus improperly permitting PFOA and/or PFOS to contaminate soil and groundwater; (3) failed to recall and/or warn users of AFFF, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the AFFF containing PFOA and/or PFOS.

84. As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's property has been contaminated, and will continue to be contaminated, with PFOA and PFOS. This has created a significant environmental and public health hazard until such contamination may be remediated. As a direct and

[10] *See id*. (in particular, please refer to the "C8 Blood Sampling Results, Births and Pregnancies" Memorandum referenced in the article).

[11] *See id.* (in particular, please refer to the "Organic Fluorine Levels" Memorandum referenced in the article).

proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA and PFOS contamination of its property at significant expense, loss and damage to Plaintiff.

85. Defendants had a duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products, but they breached this duty. Defendants moreover breached their duty to minimize the environmental harm caused by PFOA and PFOS. Moreover, Defendants failed to warn Plaintiff of the known risks for environmental and health hazards arising from the usage of Defendants' Fluorosurfactant Products in their intended manner for its intended purpose.

### *B. <u>Source: The Fayetteville Works Site</u>*

86. The Fayetteville Works Site is a chemical manufacturing facility located on approximately 2,175 acres of real property located at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332. The Site is located 15 miles southeast of the city of Fayetteville, along the border of Bladen and Cumberland counties, and along the western edge of the Cape Fear River, upstream of Plaintiff.

87. The Site's first manufacturing area was constructed in the early 1970s. Currently, the Site manufactures plastic sheeting, safety glass, fluorochemicals, and intermediates for plastics manufacturing. A former manufacturing area, which was sold in 1992, produced nylon strapping and elastomeric tape.

88. From the early 1970s until 2015, DuPont owned and operated the Fayetteville Works Site.

89. In 2015, The Chemours Company, which at the time was a wholly owned subsidiary of DuPont, acquired Fayetteville Works from DuPont.

90. In 2015, Defendant Chemours Company FC, LLC, became the owner of the entire 2,177 acre Fayetteville Works Site along with Fluoromonomers, Nafion®

membranes, and PPA manufacturing units. The polyvinyl fluoride (PVF) resin manufacturing unit remained with the DuPont Company.

91. From 1980 until the present, millions of pounds of PFAS have been discharged/emitted/released from Fayetteville Works. The specific PFAS at issue include PFMOAA, PMPA/PFMOPrA, PFO2HXA, PEPA/PFMOBA, PFO30A, PFO4DA, PFESA-BP1/Nafion Byproduct 1, PFESA-BP2/Nafion Byproduct 2, PFECA-G, TAFN4/PFOSDA, PFHpA, and GenX, among other ("Fayetteville Works PFAS").

92. PFAS from Fayetteville Works has entered the Cape Fear River – causing extensive contamination – and traveled downstream, ultimately causing harm to Plaintiff's Property.

93. Fayetteville Works Defendants caused PFAS to enter the Cape Fear River in multiple ways: 1. PFAS were discharged directly to the Cape Fear River; 2. PFAS were emitted into the air, which led to groundwater contamination, and the contaminated groundwater flowed to the Cape Fear River; and 3. Groundwater contamination at the Fayetteville Works facility flowed to the River.

94. Defendants' manufacturing operations at the Site consist of three current perfluorinated chemical ("PFC") manufacturing areas and a former manufacturing area: Chemours Fluoromonomers and Nafion® Membrane — Manufactures Nafion® fluoropolymer membrane—a perfluorosulfonic acid (PFSA) membrane—for use in electronic cells, as well as various fluorochemicals used for Nafion® membrane, Teflon® fluoropolymer, Viton® elastomers, and other fluorinated products,

95. Chemours Polymer Processing Aid (PPA) - Manufactures a fluorochemical that is used as a processing aid for off-site fluoropolymer manufacturing—upon information and belief, the product known as "GenX." This area formerly manufactured ammonium perfluorooctanoate (APFO, the ammonium salt of PFOA, which is also known as "C8"). Chemours publicly maintains that the

last date of C8 production at the Site was April 28, 2013, and that the C8 manufactured in this area was never used in any of the other manufacturing facilities at the Site.

96. DuPont Company PVF - Manufactures polyvinyl fluoride (PVF) resin used to produce Tedlar® film.

97. The Polymer Manufacturing Development Facility (PMDF) - Manufactured Teflon® fluorinated ethylene propylene (FEP) for electrical wiring insulation and other applications. Since the PMDF unit was permanently shut down in June 2009, it no longer manufactures DuPont Teflon®. Chemours publicly maintains that the Site did not use C8 in its processes,

98. In addition to the manufacturing operations at the Site, Chemours operates two natural gasfired boilers and a wastewater treatment plant for the treatment of process and sanitary wastewaters from Chemours and DuPont. Hazardous wastes generated from the Chemours manufacturing processes and laboratories were, as of 2016, managed at the permitted Hazardous Waste Container Storage Area, in four permitted hazardous waste tanks, and at the 90-day ignitable waste accumulation area prior to being shipped offsite for treatment, disposal, or recycling.

99. The Site also has at least one stack that has operated since 1980. Many thousands of pounds of PFAS has been released into the air, much of which ultimately entered the Cape Fear River.

100. Hundreds of different types of PFAS have been released into the environment – including the Cape Fear River – by the Fayetteville Works Defendants. Chemours has identified approximately 30 different PFAS compounds in the environment associated with Fayetteville Works. Chemours also prepared a report finding over 250 previously unknown PFAS in its process and non-process wastewater and stormwater at Fayetteville Works.

101. All PFAS compounds — including those released at Fayetteville Works — are entirely manmade and do not occur naturally in the environment. There are thousands of known and suspected PFAS chemical structures, yet because of limited availability of information and standards, regulators have only been able to focus on a small subset of these chemicals thus far.

102. PFAS compounds possess characteristics that cause extensive and long-lasting environmental contamination and harm, including (but certainly not limited to) characteristics of mobility and persistence.

103. PFAS are generally soluble and readily transported through the soil, and then into the groundwater, where they migrate long distances, PFAS are generally persistent in that they do not readily biodegrade or chemically degrade in the environment. Generally, PFAS bioaccumulate, biopersist, and biomagnify in people.

104. Moreover, the PFAS compounds that have been studied the most - PFOA & PFOS — have been shown to be toxic at very low concentrations, Exposure to PFOA in both humans and animals is linked to a number of diseases, including but not limited to the following: kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy-induced hypertension, and immune system impacts.

105. Until recently, regulators and the public have had little access to information about the commercial applications, potential release mechanisms, and resulting exposure sources and concentrations for many of the individual PFAS released at Fayetteville Works, of which there are thousands, As a result, there is little knowledge of their environmental fate and transport characteristics, or their toxicological properties, because they have not been studied. Most of the data on fate and toxicity has been provided by industry and is limited to the required testing. Non-industry researchers are hindered by the difficulty of obtaining from the manufacturers (who treat these substances as proprietary) the necessary reference

standards they need to study the toxicity of these substances in the laboratory and to develop analytical techniques to detect and quantify their presence in the environment.

106. However, generally the PFAS compounds released from Fayetteville Works are expected to exhibit harmful effects given their structural and functional similarities to PFOA, PFOS, and other PFAS compounds that are known to be toxic at low levels. And recent literature suggests as much and show that other PFAS compounds are associated with similar health outcomes as PFOA and PFOS. Consequently, PFAS contamination in drinking water presents a serious threat to the health of those exposed.

107. PFAS compounds may enter the human body through a number of different pathways. In addition to consumption through liquid or food, PFAS compounds may also be inhaled or absorbed through the skin. Newborns are particularly susceptive to PFAS toxicity. Exposures to newborns can be higher—compared to other subpopulations—through breastmilk, formula that has been prepared with drinking water contaminated with PFAS compounds.

108. GenX is one of the many PFAS compounds that has been released from Fayetteville Works facility for decades. In 2022, EPA established a health advisory limit for GenX in drinking water at a level of 10 ppt.

### *1. DUPONT'S KNOWLEDGE OF THE DANGERS OF PFAS*

109. DuPont began using PFOA and other PFAS in the 1950s and, quickly thereafter, developed an understanding of the dangers of using these chemicals. During this time, DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and biopersists in the environment. DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to its PFOA, including via public and private drinking water supplies.

110. DuPont company scientists issued internal warnings about the toxicity associated with PFOA as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

111. In 1978, based on information it had received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

112. By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. DuPont did not report this data or the results of its worker health analysis to any government agency or community at that time.

113. The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

114. Not only did DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

115. In fact, DuPont had reported to the EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of the study of its own plant workers.

116. While DuPont knew about this toxicity danger as early as the 1960s, DuPont was also aware that PFAS was capable of contaminating the surrounding environment, leading to human exposure.

117. By 1980 at the latest, DuPont knew that PFAS compounds could be emitted into the air from its facilities and that those air emissions could travel beyond facility boundaries,

118. Further, by no later than 1984, DuPont was aware that one of its PFAS compounds — PFOA — is biopersistent, DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from DuPont's manufacturing facilities, as well as potential replacement materials. DuPont chose not to use either available technologies or replacement materials, despite knowing PFOA's toxicity.

119. During the 1984 Meeting, the DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business and that these departments had "no incentive to take any other position."

120. DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not

pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health.

121. In 2004, the EPA filed an action against DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

### 2. *MANUFACTURE OF GENX AND OTHER PFAS AT FAYETTEVILLE WORKS*

122. Since 1980, DuPont — and later Chemours — have been aware that GenX was & is released into the environment around the Fayetteville Works Site.

123. Prior to 2002, DuPont purchased PFOA from 3M. In May 2002, because of the threat posed by PFOA to human health and the environment, 3M announced that it would cease to manufacture PFOA altogether. In October 2002—so that it could continue manufacturing a range of profitable Teflon® products— DuPont began making PFOA at its Fayetteville Works facility. It continued to do so until 2013. During this time, the Fayetteville Works facility emitted PFOA into the environment, some of which led to contamination of Plaintiff's Property.

124. On May 3, 2001, DuPont submitted a National Pollutant Discharge Elimination System ("NPDES") permit renewal application to North Carolina's Division of Water Quality, subsequently renamed the Division of Water Resources (the "DWR"), a division of DEQ, stating that it intended to begin manufacturing PFOA at Fayetteville Works. During the application process, DuPont represented that: (1) PFOA does not pose a health concern to humans or animals at levels present in the workplace or environment; (2) DuPont had used PFOA for 40 years with no

observed health effects on workers; and (3) PFOA is neither a known developmental toxin nor a known carcinogen. DuPont knew or should have known its representations were false.

125. Thereafter in 2006, the E.P.A. began a voluntary PFOA Stewardship Program, in which DuPont participated, designed to prevent C8 from further entering the environment and to eliminate C8 from consumer products by 2015.

126. In 2008, DuPont submitted to E.P.A. notices pursuant to the TSCA of its intent to manufacture GenX.

127. DuPont generated GenX — in part as a byproduct — and discharged it from the Site for decades by 2008, but in 2009 DuPont began to purposely manufacture GenX as an alternative to C8.

128. On January 28, 2009, EPA and DuPont entered into a Consent Order governing the manufacture of GenX. The Consent Order provides that "EPA has concerns that [GenX] will persist in the environment, could bioaccumulate, and be toxic... to people, wild animals, and birds." The Consent Order also stated that EPA had "human health concerns" regarding GenX and that "uncontrolled .. . disposal of [GenX] may present an unreasonable risk of injury to human health and the environment."

129. Due to these risks, the 2009 EPA Consent Order required DuPont to "recover and capture (destroy) or recycle [GenX] at an overall efficiency of 99% from all the effluent process streams and the air emissions (point source and fugitive)."

130. DuPont and Chemours failed to disclose to DWR the discharge of GenX and related compounds into the air and into the Cape Fear River from another processing unit at the Fayetteville Works site.

131. In particular, none of the DuPont or Chemours NPDES permit applications reference "GenX" or any chemical name, formula, or CAS number that identify any GenX or related compounds in the Fayetteville Works' discharge.

132. In fact, information provided by DuPont and Chemours led DWR staff to reasonably believe that GenX was not being discharged into the Cape Fear River. On August 26, 2010, representatives of DuPont met with the DEQ staff regarding the company's anticipated use of GenX technology at the Fayetteville Works as a replacement for PFOA.

133. The information DuPont provided indicated that the GenX would be produced in a closed-loop system that would not result in the discharge of those compounds outside Fayetteville Works, particularly not directly into the Cape Fear River.

134. DuPont represented that the wastewater generated from the manufacture of GenX would be collected and shipped off-site for disposal, and therefore, this wastewater would not be discharged into the Fayetteville Works' wastewater treatment plant or into the Cape Fear River.

135. On April 29, 2011, DuPont submitted an NPDES permit renewal application confirming that "all process wastewater generated from [the PPA Manufacturing Area] is collected and shipped off-site for disposal" and that "no process wastewater from this manufacturing facility is discharged to the Site's biological [waste water treatment plant] or to the Cape Fear River." The application made no mention of GenX or related compounds being discharged into the Cape Fear River or otherwise into the environment.

136. On February 6, 2012, DWR issued a renewal permit with an effective date of March 1, 2012 ("2012 Permit"), The 2012 Permit makes no mention of GenX as part of the authorized discharge from Fayetteville Works.

137. On November 10, 2016, EPA and Dr. Detlef Knappe, a Professor at N.C. State University, published a study that identified the presence of GenX and other PFAS in the Cape Fear River. The study indicated that levels of GenX in one sample area in the Cape Fear River were as high as 4,500 ng/L, which is 450 times higher than the health goal later set by EPA.

138. Only after substantial media coverage in 2017 regarding the presence of GenX in the Cape Fear River did Chemours inform DEQ that it and DuPont had discharged GenX and other PFAS as byproducts for decades at the Fayetteville Works and routinely discharged those byproducts into the Cape Fear River and into the air.

139. Then, only after DEQ's request did Chemours provide internal health studies it and DuPont had on GenX—studies that DuPont or Chemours had previously conducted (without disclosing).

### 3. *THE 2019 CONSENT ORDER*

140. After Dr. Knappe's discovery of PFAS in the Cape Fear River, public concern focused on contamination in the River rather than groundwater surrounding the Fayetteville Works Site. Eventually, Chemours and the State of North Carolina sampled wells surrounding the Fayetteville Works Site and found that a number of residential groundwater wells surrounding the Site had elevated levels of GenX.

141. On February 25, 2019, the State of North Carolina & Cape Fear River Watch entered into a Consent Order with The Chemours Company FC, LLC, which required Chemours to pay a $12 million fine and, among other things, conduct a program to determine the extent of contamination in private groundwater wells around the facility. The full extent of the contamination has not yet been determined, but Fayetteville Works Defendants' PFAS have been detected approximately away from the facility.

142. In addition, the Consent Order requires Chemours to provide replacement drinking water supplies for certain households or entities. For drinking water wells where GenX has been detected at concentrations greater than a health standard — now 10 ppt— Chemours must provide for connection to a public water supply or, if such connection would cost greater than $75,000, connection to a whole-house filtration system. For drinking water wells where the combined concentration of certain PFASs exceed 70 ng/L or where any individual PFAS exceeds 10 ng/L

("70/10 health goal"), Chemours must provide up to three under-sink reverse osmosis drinking water systems.

143. The Consent Order only considers 12 of the almost 30 PFAS compounds which have been associated with the Fayetteville Works Site. The 12 PFAS are listed on Attachment C and include: PFMOAA, PMPA/PFMOPrA, PFO2HXA, PEPA/PFMOBA, PFO30A, PFO4DA, PFESA-BP1/Nafion Byproduct 1, PFESA-BP2/Nafion Byproduct 2, PFECA-G, TAFN4/PFOSDA, PFHpA, GenX.

144. The Consent Order requires Chemours to implement multiple remedial strategies to significantly reduce PFAS discharges from Fayetteville Works to the Cape Fear River. Chemours could have implemented strategies to prevent the discharge of PFAS decades earlier, and if it had done so, the County's harm would have been lessened substantially, if not entirely.

145. While Chemours' post-2019 remedial measures have resulted in a reduction in PFAS loading to the Cape Fear River from the Fayetteville Works site, PFAS from Fayetteville Works continue to enter the Cape Fear River and flow downstream to the County. This is in large part because decades of air emissions caused extensive groundwater contamination for miles outside of the Fayetteville Works site, and the contaminated groundwater ultimately flows to the Cape Fear River. Chemours has not stopped the flow of contaminated groundwater to the Cape Fear River.

146. The Consent Order also required Chemours to control air emissions of "all PFAS at an efficiency of 99.99%" through installation of a thermal oxidizer. Chemours claims to have started operation of the thermal oxidizer later that year in December 2019. Thermal oxidizer technology has been used by industry members for decades, and DuPont and Chemours could have installed the thermal oxidizer decades earlier. Had they done so, the County's harm would have been lessened substantially, if not entirely.

147. Fayetteville Works Defendants understood the need for technology to control air emissions. When it spun Chemours off in 2015, DuPont knew that the Fayetteville Works Plan had been discharging PFAS into the nearby environment through air emissions for decades. In 2010, DuPont commissioned a "Blue Ribbon Panel" of company managers, scientists and engineers to identify solutions. The Panel provided several recommendations to reduce environmental emissions, one of which would have resulted in nearly the same — if not the exact same — technology required by the 2019 Consent Order to control air emissions.

148. Ultimately, DuPont opted for a band-aid solution. Rather than adopt the panel's recommendations, DuPont installed a $2.3 million gas permeator system to deal with one waste stream (out of many) responsible for certain fluorinated compounds. DuPont terminated the project in late 2013 due to cost concerns. Chemours would have been aware of these facts since its existence in 2015 and failed to control PFAS air emissions until required to do so in the 2019 Consent Order.

149. Even after the 2019 Consent Order, and for the indefinite future, Chemours will continue to emit PFAS compounds, causing additional contamination and a continual and recurring threat of harm to the County.

#### *4. FAYETTEVILLE WORKS DEFENDANTS' STATUTORY VIOLATIONS*

150. Fayetteville Works Defendants violated their ongoing duty under both North Carolina and Federal law to disclose to the State of North Carolina any known constituents in their discharges that posed a potential risk to human health, in connection with their NPDES Permit. See, eg, 15A N.C.A.C. 2H.0105G)(requiring applicants to disclose "all known toxic components that can be reasonably expected to be in the discharge, including but not limited to those contained in a priority pollutant analysis"); 14A N.C.A.C. 2B.0202(64) (defining toxic substances to include "any substance or combination of substances...which after discharge and upon exposure...has the potential to cause death, disease, behavioral abnormalities, cancer,

genetic mutations, physiological malfunctions (including malfunctions or suppression in reproduction or growth) or physical deformities in such organisms or their offspring"), 40 C.F.R. § 122.41(1)(8) (requiring, as a standard NPDES permit condition, that "where the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application . . . it shall promptly submit such facts or information."); U.S. Envt'l Prot. Agency, "Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits," available at https://www3.epa.gov/npdes/pubs/owm0131.pdf.

151. Fayetteville Works Defendants also violated, and continue to violate, their duty under the NPDES Permit to take "all reasonable steps to minimize or prevent any discharge ... in violation of [its] permit with a reasonable likelihood of adversely affecting human health or the environment," 40 C.F.R. § 122.41(d), as well as their duty under North Carolina groundwater regulations to take action to terminate and control any discharge of "waste or hazardous substance to the groundwaters of the State, or in proximity thereto," mitigate any resulting hazards, and notify State regulators. ISA N.C.A.C, 2L .0106(b).

152. Fayetteville Works Defendants' ongoing discharges into the Cape Fear River have violated and continue to violate, North Carolina water quality standards for surface water, in that they:

a. render the Cape Fear River waters injurious to aquatic life or wildlife, recreational activities, public health, or impair the waters for one or more of their designated uses, 15A N.C.A.C. 02B .0208(a); and

b. preclude, on a short term and/or long term basis, one or more of the best uses of the water, including as "a source of water supply for drinking, culinary, or food processing purposes" and for "aquatic life propagation and maintenance of biological integrity

(including fishing and fish), wildlife, secondary recreation, [and] agriculture." See 15A N.C.A.C. 2B,0216(2) and 15A N.C.A.C. 2B .0216(1) & .0211(1).

153. The Fayetteville Works is a major source of air pollution and is required to obtain and operate within a Clean Air Act Title V operating permit. See 42 U.S.C. § 7661 et seq.; see also N.C. Gen. Stat. §§ 143-215.107(a)(10), 143-215.3(c); 40 C.F.R. pt. 70, app. A. Further, the permit requires the submission of annual emissions inventories to DEQ detailing the Fayetteville Works' actual emissions of various air pollutants into the environment for the previous calendar year. See 15A N.C.A.C, 2Q .0207. The accuracy of these reports is required to be certified by a responsible official from the Fayetteville Works. See id.

154. DuPont and Chemours have emitted GenX and other Fayetteville Works PFAS compounds into the air at levels that far exceed emission rates that they had previously reported to the North Carolina Department of Environmental Quality and its predecessor agencies.

155. Chemours continues to violate regulations and requirements regarding air pollution from Fayetteville Works. On August 26, 2021, North Carolina Department of Environmental Quality's Division of Air Quality issued a Notice of Violation to Chemours regarding air emissions. Under the Fayetteville Works facility's air permit, Chemours must demonstrate compliance with the GenX emission limit of 23.027 pounds per year. In March 2021, excess GenX emissions resulted in noncompliance with the rolling 12-month totals for March, April, May and June of 2021. As of June 30, 2021, Chemours reported annual GenX emissions of 32.024 pounds.

156. Starting in 2017, Chemours's annual emissions inventories were required to include GenX. Testing revealed that Chemours was emitting into the air thousands of pounds of GenX per year. Upon information and belief, the PFAS Defendants emitted PFAS for several decades prior to GenX being included in the

annual emissions inventories. Such emissions led to widespread dispersal of PFAS. This dispersal of PFAS has harmed Plaintiff.

157. Fayetteville Works Defendants' ongoing and recurring discharges and emissions of PFAS causing contamination of groundwater have violated, and continue to violate, North Carolina groundwater standards in that these discharges/emissions are comprised of substances which are not naturally occurring and for which no standard is specified, but are contaminating groundwater at or above the practical quantitation limit (PQL), as prohibited by 15A N.C.A.C. 2L .0202(c).

158. Fayetteville Works Defendants have also violated provisions of the Toxic Substances Control Act. On February 13, 2019, the United States Environmental Protection Agency issued a Notice of Violation to The Chemours Company concerning the company's manufacture of new chemicals — including GenX and other PFAS compounds — without proper reporting. The Notice specifically references Chemours' "release of [GenX] to the environment and the [] requirement for Chemours to use [GenX] in an enclosed process."

### *C. THE HARM TO PLAINTIFF RESULTING FROM PFAS CONTAMINATION*

159. PFOA, PFOS, and Fayetteville Works PFAS have been detected in Plaintiff's water supplies and landfill properties (specifically, groundwater beneath its landfill). On at least one occasion, PFAS have been present at levels above the federally advised Health Advisory levels in untreated drinking water and in groundwater beneath the County's landfill.

160. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, in Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant injury and damage to Plaintiff. It is the contention of Plaintiff that any detectible level of PFAS in its groundwater source, well water, landfill properties, or elsewhere on its property requires investigation, remediation and monitoring.

161. Plaintiff has conducted and continues to conduct sampling, studies, and investigations related to PFAS, which requires funding by Plaintiff, including costs to conduct sampling, costs for its personnel to supervise the assessments, costs to develop PFAS treatment approaches, and costs to analyze available alternatives.

162. The invasion of Plaintiff's Property with PFAS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiff's Property each day—the result of which is a new harm to the Plaintiff and its property in each and every occurrence.

163. The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean supplies of fresh drinking water on which Plaintiff's wells depend. Plaintiff's interests in protecting the quality of its citizens' limited drinking water supplies constitutes a reason for seeking damages sufficient to restore such drinking water supplies to their pre-contamination condition.

164. Plaintiff has incurred, and will incur, costs associated with PFAS at its landfill properties.

165. Through this action, Plaintiff seeks to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from continuous and ongoing contamination of Plaintiff's Property by Defendants' Fluorosurfactant Products and Fayetteville Works PFAS. Such damages moreover include, but are not limited to, the past and future costs associated with the investigation, remediation, restoration, monitoring, and treatment of Plaintiff's Property.

## FIRST CAUSE OF ACTION
## PUBLIC NUISANCE

166. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

167. Defendants manufactured, distributed, marketed, and promoted PFAS-containing products, including AFFF, in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Plaintiff's Property.

168. The Fayetteville Works Defendants' operation of the Fayetteville Works facility, and their discharges, emissions, disposal, and releases of PFAS chemicals, therefore, caused a public nuisance that unreasonably contaminated groundwater, surface water, and landfill properties, and presents an unreasonable health hazard to thousands of County residents.

169. The presence of PFAS interferes with the use of Plaintiff's Property.

170. The presence of PFAS causes significant costs, inconvenience and annoyance to Plaintiff, who is charged with supplying potable drinking water to residences, businesses, chapel, public buildings and other users in the County, and operation of a landfill.

171. The condition affects a substantial number of people in the community, who rely upon Plaintiff to provide water for residential, commercial, and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

172. An ordinary person would be reasonably annoyed or disturbed by the presence in public drinking water of toxic PFAS that endanger human health and degrade water quality.

173. The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing PFAS and PFAS-containing products and concealing the dangers posed to human health and the environment.

174. Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs to remove PFAS from its water supply and landfill properties.

175. Continuing harm caused by Fayetteville Works Defendants includes not only their ongoing emissions and releases of PFAS chemicals but also the continued propagation of Fayetteville Works Defendants' historical releases of PFAS chemicals through migration in groundwater, leaching from soil, and release from sediments.

176. Plaintiff did not consent to the conduct that resulted in the contamination of Plaintiff's Property.

177. Defendants' conduct was a substantial factor in causing harm to Plaintiff.

178. Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiff's Property. Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public water supply wells and landfill properties.

179. The Fayetteville Works Defendants knew or, in the exercise of reasonable care, should have known that their manufacturing and disposal operations at the Fayetteville Works Site were causing the type of contamination now found in groundwater, surface water, and landfill properties in the County. Fayetteville Works Defendants knew of the bioaccumulative, persistent properties of PFAS and that the Fayetteville Works Site had emitted PFAS chemicals for decades. Fayetteville Works Defendants knew or should have known that their PFAS chemicals would contaminate the water supply and landfill properties of the County. In addition, Fayetteville Works Defendants knew that at least some PFAS chemicals – like PFOA — are associated with serious toxic effects and cancers in humans exposed through drinking water, and that other PFAS compounds — like GenX among others — are associated with serious toxic effects in animals, have not been studied in humans, and present a likely risk to human health. As a result, it was

foreseeable to Fayetteville Works Defendants that their PFAS chemicals could contaminate the County public water supply and landfill. Fayetteville Works Defendants thus knew, or should have known, that their contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of the County's public water supply and landfill properties. Defendants' interference has caused a public health hazard in the County. The condition created by Fayetteville Works Defendants adversely affects the quality of the water drawn from surface water and groundwater in the County (and the County's landfill), and thus injuriously affects the community at large and the public health.

180. As a direct and proximate result of Defendants' creation of a public nuisance, Plaintiff has suffered, and continues to suffer, monetary damages to be proven at trial.

181. Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they manufactured, promoted, sold, and supplied PFAS-containing products including AFFF, knowing that these products would release PFAS that are toxic, cannot be contained, and last for centuries.

182. Fayetteville Works Defendants' conduct in secretly releasing persistent, bioaccumulative, and toxic perfluoroalkyl substances into the County, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Fayetteville Works Defendants acted with a conscious disregard for and indifference to the rights and safety of the public by contaminating the County's drinking water and landfill properties, which Fayetteville Works Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm and constitute a public nuisance

183. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, all amounts necessary

to abate the public nuisance Defendants created, and all costs and expenses of suit and pre- and post-judgment interest.

**<u>SECOND CAUSE OF ACTION</u>**
**PRIVATE NUISANCE**

184. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

185. Plaintiff's Property has been contaminated by PFAS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

186. PFAS contamination is a substantial and unreasonable interference with the use of Plaintiff's Property to provide potable drinking water. The chemicals contaminate Plaintiff's Property and threaten the health of everyone in the community who relies upon Plaintiff to provide potable water.

187. Fayetteville Works Defendants' operation of the Fayetteville Works facility, and their discharges, emissions, and releases of PFAS chemicals constitute an unreasonable use of Defendants' land which has caused substantial and unreasonable interference with Plaintiff's use and enjoyment of their property and the health of its residents.

188. Plaintiff's Property has been contaminated by PFAS compounds as a direct and proximate result of the acts and omissions of Defendants as set forth above.

189. The nuisance Defendants have created is ongoing and the harm to Plaintiff will continue indefinitely.

190. PFAS contamination caused by Defendants' conduct has damaged Plaintiff's Property and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's property.

**<u>THIRD CAUSE OF ACTION</u>**
**PRODUCTS LIABILITY- INADEQUATE DESIGN (G.S. § 99B-6)**

191. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

192. Plaintiff was harmed by PFAS-containing products including AFFF which were designed, manufactured, sold, and distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

193. The design of Defendants' PFAS-containing products were defective because, at the time of the products' manufacture, Defendant acted unreasonably in designing or formulating the products, and this conduct was a proximate cause of the Plaintiff's harm.

194. In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the products.

195. Moreover, at the time the product left Defendants' control, the design or formulation of the products was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

196. The design of Defendants' PFAS-containing products caused harm to Plaintiff.

197. The design of Defendants' PFAS-containing products was a substantial factor in causing harm to Plaintiff.

198. The gravity of the huge environmental harm resulting from the use of Defendants' PFAS-containing products was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

199. The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' PFAS-containing products were toxic, could not be contained, and do not readily degrade in the environment.

200. Defendants’ conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

201. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted, or failed to act, with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY- FAILURE TO WARN (G.S. § 99B-5)

202. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

203. Plaintiff was harmed by PFOA, PFOS, and other PFAS-containing products that Defendants designed, manufactured, sold, and distributed.

204. Defendants’ PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

205. Defendants’ PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

206. The potential environmental hazard and toxicity risks of Defendants’ PFAS- containing products were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants’ superior knowledge about their products at the time of design, manufacture, sale, and distribution.

207. The potential environmental hazard and toxicity risks presented an unreasonably dangerous condition when Defendants’ PFAS-containing products were and are used or misused in an intended or reasonably foreseeable way, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users and bystanders including public water providers like Plaintiff.

208. The risks of PFAS are not a matter of common knowledge. Ordinary consumers and third-parties would not have recognized the potential risks.

209. Defendants failed to adequately warn or instruct of the potential risks.

210. Plaintiff was, is, and will be harmed.

211. The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiff's harm.

212. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

213. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

**FIFTH CAUSE ACTION**
**NEGLIGENCE**

214. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

215. Defendants designed, manufactured, sold, and distributed PFAS-containing products.

216. Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

217. Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

218. Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with PFAS-containing products.

219. Defendants knew or reasonably should have known that their PFAS-containing products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

220. Defendants knew or reasonably should have known that users and third parties would not realize the danger.

221. At all times, it was reasonably foreseeable to Defendants that, when used as intended, PFAS-containing products would cause contamination of soil and water and would present risks to human and environmental health.

222. Defendants failed to adequately warn of the danger or instruct on the safe use of PFAS-containing products.

223. A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of PFAS-containing products.

224. Fayetteville Works Defendants owed Plaintiff a duty of reasonable care in the manufacture, management, use, storage, handling, and disposal of PFAS chemicals used/created/manufactured at Fayetteville Works, in the release of these substances in and around the Fayetteville Works facility, and in the remediation of contamination those releases and/or disposals caused.

225. Fayetteville Works Defendants had a duty, in particular, to: (1) identify the potentially harmful PFAS compounds associated with their operations that were released into the air, soil, groundwater, and surface water, or otherwise disposed of; (2) investigate and understand the characteristics of the PFAS chemicals associated with their operations before releasing those substances into the environment or disposing of PFAS chemicals in a way where such compounds will enter drinking water or groundwater; (3) conduct their operations in a manner that would not unreasonably endanger human health and the environment; (4) investigate and remediate environmental releases that they knew posed a potential risk to human health and the environment; and (5) warn Plaintiff of environmental releases that

created a probable risk to human health in public water supply, due to the persistence and toxicity of these substances and the fact that they are not removed through conventional water treatment processes.

226. Fayetteville Works Defendants failed to exercise ordinary and reasonable care in the manufacture, management, use, storage, and handling of their PFAS chemicals and in the release of these substances from Fayetteville Works, and in the remediation of contamination in the County that those releases caused.

227. Fayetteville Works Defendants knew or, in the exercise of reasonable care, should have known that their manufacturing operations at the Fayetteville Works Site were causing the type of contamination now found in drinking water and landfill properties in the County. Fayetteville Works Defendants knew of the bioaccumulative, persistent properties of PFAS and knew that the Fayetteville Works Site had released PFAS chemicals into the Cape Fear River for decades, such that PFAS compounds would persist in the environment in and around the County for a long time into the future. Fayetteville Works Defendants knew that their PFAS chemicals would contaminate the County's public water supply and landfill properties. In addition, Fayetteville Works Defendants knew that at least some PFAS chemicals — like PFOA — are associated with serious toxic effects and cancers in humans exposed through drinking water, and that other PFAS compounds — like GenX among others — are associated with serious toxic effects in animals, have not been studied in humans, and present a likely risk to human health. As a result, it was foreseeable to Fayetteville Works Defendants that the County's public water supply and landfill properties would be harmed by Fayetteville Works Defendants' PFAS compounds,

228. Fayetteville Works Defendants' conduct in secretly releasing and/or improperly disposing of their persistent, bioaccumulative, and toxic perfluoroalkyl substances and contaminating the County's public water supply and landfill properties, all the while misleading state and Federal regulators and the public, was

willful and wanton, in that Fayetteville Works Defendants acted with a conscious disregard for and indifference to the rights and safety of others, which Fayetteville Works Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm.

229. Plaintiff was, is, and will be harmed.

230. Defendants' failure to warn or instruct proximately caused Plaintiff's harm.

## SIXTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (G.S. § 25-2-314)

231. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

232. At all relevant times, Defendants were in the business of designing, manufacturing, selling, and distributing PFAS-containing products, such as those at issue here.

233. Defendants warranted that their PFAS-containing products are merchantable.

234. Defendants designed, manufactured, sold, and distributed PFAS-containing products without adequate warning of toxicity, potential human health risks, and environmental hazards.

235. Defendants' PFAS-containing products were defective or otherwise unmerchantable when they left Defendants' control.

236. When used for the ordinary purposes for which such PFAS-containing products were used and intended, PFAS-containing products were defective or otherwise unmerchantable because PFAS compounds escaped from those products, causing contamination of soil and water and presenting risks to human and environmental health.

237. Defendants breached their implied warranty of merchantability because the goods are not fit for the ordinary purposes for which such goods are used.

238. Defendants breached their implied warranty of merchantability because the PFAS-containing products were not packaged and labeled with the appropriate warnings about contamination and resulting health risks or with instructions that would have prevented the contamination.

239. Defendants became aware of the human health risks and environmental dangers presented by PFAS-containing products by no later than the year 2000.

240. Plaintiff was, is, and will be harmed.

241. Defendants' breach of the implied warranty of merchantability proximately caused Plaintiff's harm.

242. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

243. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## SEVENTH CAUSE OF ACTION
## TRESPASS

244. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

245. Plaintiff owns and operates real property including drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment. Plaintiff has significant property interests in the waters it appropriates and uses, in its distribution infrastructure, and also has significant property interests in the groundwaters that supply its wells.

246. Plaintiff owns and operates a landfill and has a significant property interest in its system and properties within.

247. Defendants intentionally, recklessly, and negligently caused PFAS to enter into the groundwaters, aquifers, and drinking water production wells operated by Plaintiff, as well as the landfill of Plaintiff.

248. Plaintiff did not give permission for the entry.

249. Plaintiff was, is, and will be actually harmed by the entry of PFAS onto its property.

250. Defendants' conduct proximately caused Plaintiff's harm.

251. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

252. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## EIGHTH CAUSE OF ACTION
## CIVIL CONSPIRACY

253. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

254. At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to the environment, including Plaintiff's Property.

255. Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to the Plaintiff. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of:

a. intentionally misrepresenting to the EPA and the public that AFFF containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment;

b. concealing the dangers of AFFF containing PFOA and/or PFOS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFOA and/or PFOS were being disposed of;

c. concealing the dangers of PFOA and/or PFOS from consumers and the public; and

d. using their considerable resources to fight legislation concerning PFOA and PFOS.

256. As a direct and proximate result of Defendants' conspiracy, Defendants' AFFF products at all times relevant to this litigation have:

a. posed and continue to pose a threat to Plaintiff's Property;

b. contaminated and will continue to contaminate Plaintiff's Property;

c. contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiff's Property;

d. required and will continue to require testing and monitoring of Plaintiff's Property for PFOA and PFOS contamination;

e. required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Plaintiff, removal and disposal of the contamination;

f. diminished Plaintiff's confidence in, and the use and enjoyment of, Plaintiff's Property;

g. diminished Plaintiff's Property value due to actual, impending, and/or threatened PFOA and PFOS contamination; and

h. caused and/or will cause Plaintiff to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of its property.

**NINTH CAUSE OF ACTION**

**FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)**

256. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

257. Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act or other applicable law against DuPont.

258. Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

259. Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

260. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

261. Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the

manufacture and sale of PFAS compounds and products that contain PFAS compounds.

262. Upon information and belief, DuPont has (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

263. Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Plaintiff, that have been damaged as a result of DuPont's actions as described in this Complaint.

264. Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

265. Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

266. Plaintiff further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

**<u>PUNITIVE DAMAGES</u>**

267. Under the applicable laws of the State of North Carolina, Plaintiff seeks Punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged in this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:
   a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;
   b. costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiff's Property or, in the alternative, the costs and expenses associated with and related to the removal and disposal of the contamination;
   c. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property; and
   d. Avoiding the transfer of DuPont's liabilities for the claims brought in this Complaint;
2. Punitive damages;
3. Consequential damages;
4. Costs, disbursements and attorneys' fees of this lawsuit;
5. Pre-judgment and post-judgment interest; and
6. Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a jury trial.

[SIGNATURES APPEAR ON NEXT PAGE]

This the 6th day of October, 2025.


/s/ *A. Charles Ellis*
A. Charles Ellis (NC Bar No. 10865)
**Ward and Smith, P.A.**
Post Office Box 8088
Greenville, NC 27835-8088
Telephone: 252-215-4009
ace@wardandsmith.com
docket@wardandsmith.com

Scott Summy (NC Bar No. 7171)
Cary McDougal (TX Bar No. 13569600)
Carla Burke Pickrel (TX Bar No. 24012490)
Jason Julius (TX Bar No. 24131101)
Brett Land (NC Bar 60697)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
ssummy@baronbudd.com
cmcdougal@baronbudd.com
cburkepickrel@baronbudd.com
jjulius@baronbudd.com
bland@baronbudd.com

J. Harold Seagle (NC Bar No. 8017)
**Seagle Law, PLLC**
Post Office Box 15307
Asheville, NC 28813
haroldseagle@charter.net
828-545-7777

Philip F. Cossich, Jr.
Brandon J. Taylor (LA Bar No. 27662)
Darren Sumich (LA Bar No. 23321)
David A. Parsiola (LA Bar No. 21005)
Christina M. Cossich (LA Bar No. 32407)
Andrew Cvitanovic (LA Bar No. 34500)
Luana N. Smith (LA Bar No. 35534)
**COSSICH, SUMICH, PARSIOLA**
**& TAYLOR, LLC**

8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000